500 P.2d 1153

**Elly BEECK and Herman Beeck, her husband, Appellants,**

**v.**

**TUCSON GENERAL HOSPITAL, Appellee.**

**No. 2 CA–CIV 1043.**

Court of Appeals of Arizona, Division 2.

Sept. 19, 1972.

Rehearing Denied Oct. 31, 1972.

Review Denied Nov. 28, 1972.

**166**

Paul G. Rees, Jr., and Richard M. Davis, Tucson, co-counsel, for appellants.

Spaid, Fish, Briney & Duffield by Richard Briney, Tucson, for appellee.

HATHAWAY, Judge.

Appellants, Elly Beeck and Herman Beeck, brought a medical malpractice action against the appellee, Tucson General Hospital, and against other defendants, doctors of Osteopathy, who are not appellees herein. This appeal is from an order of the trial court granting Tucson General Hospital's motion for summary judgment. The court ruled, in essence, that the hospital could not be liable for the acts of a radiologist, who was held to be an independent contractor, or for the acts of an x-ray technician employed by the hospital, who was held to be a "borrowed servant" of the radiologist. Both rulings are challenged on this appeal.

In 1968, Elly Beeck experienced back pains and consulted Dr. Louis Brickler who arranged for her admission to Tucson General Hospital and subsequently referred her to Dr. Willard Brown, a specialist in orthopedic surgery. Dr. Brown was of the opinion that she might be suffering from a herniated lumbar disc, and recommended she undergo a lumbar myelogram to determine the exact nature of her ailment.

Arrangements were made to conduct the myelogram in an x-ray room at Tucson General. Dr. Brown, Dr. Frederick Rente, who was to perform the fluoroscopic examination, and Lester Henry, an x-ray technician were present and participated in the examination. During the examination, the screen of the x-ray machine, operated by Dr. Rente, descended to a point where it struck a needle which Dr. Brown had inserted in the subarachnoid space of Mrs. Beeck's spine, where the spinal fluid is located, for purposes of injecting a fluid dye. The x-ray machine collided with the needle because of the failure to place the descent-arresting stop on the machine. Fluid dye escaped from the desired area, and the attempt to perform the myelogram was abandoned. Subsequently, Mrs. Beeck began having respiratory difficulties. It was Dr. Brown's opinion that " . . . she had contracted pneumonia from the extravasation of the dye from the myelographic procedure." He further opined that the extravasation of the dye may have resulted from his inserting the needle too deeply when additional dye was injected. He indicated, however, that it was "just as probable" that the extravasation was caused by the x-ray screen striking the needle.

Suit was filed alleging negligence by Drs. Brickler, Brown, Rente and Tucson General. Dr. Brickler's motion for summary judgment on the pleadings was granted, and is not being appealed. Tucson General moved for summary judgment and after considering the pleadings, depositions, answers to interrogatories and admissions, the trial court found there was no genuine issue as to any material fact and concluded that Lester Henry was a "loaned servant" and that as a matter of law, Dr. Rente was an independent contractor, and Tucson General's motion for summary judgment was granted.

Appellant contends a factual issue is presented with reference to Tucson General's liability under the doctrine of *respondeat superior* as to both Henry and Dr. Rente. Answers to interrogatories and admissions must, of course, be viewed most favorably in support of the party opposing the motion. Tessitore v. McGilvra, 105 Ariz. 91, 459 P.2d 716 (1969), supplemented on rehearing, 105 Ariz. 198, 461 P.2d

675 (1969); Peterson v. Valley National Bank, 90 Ariz. 361, 368 P.2d 317 (1962). Appellee's position is that any factual dispute is inconsequential, that the significant centers of disagreement are on points of law. We agree with appellee's analysis— that a question of law is presented. We disagree, however, with the trial court's resolution of the question.

## DOES THE RECORD COMPEL THE CONCLUSION THAT THE RADIOLOGIST WAS AN INDEPENDENT CONTRACTOR?

"*Respondeat superior*" or, "let the master answer," Black's Law Dictionary 1475 (4th ed. 1968), is the phrase used to express the area of the master's liability for torts of servants arising out of service to the masters. Rationale for the doctrine has been explained as follows:

"The expansion of the master's activity by use of the activity of others inevitably leads to wreckage caused by it, and it is proper for him to pay for this when tortiously caused in return for the benefits he receives from his servant's proper conduct." W. A. Seavey, Law of Agency, § 83, at 141 (1964).

Another basis for vicarious liability in the area of medical malpractice has been given:

" . . . the enterprise which occasions negligent injury is best able to distribute its burdens by public liability insurance or otherwise—seems at least as true of medical situations as of other tort cases. Doubtless the basic trend in malpractice law, as in tort law generally, in the field of vicarious liability is toward rules which facilitate broad distribution of the loss." Medical Malpractice, Vol. 1, p. 485.

Application of the doctrine of *respondeat superior* to professional and technically skilled personnel, has frequently bogged down in the question of the right of the employer to control the conduct of the employee. The physician's vocation is viewed in some cases as requiring such high skill and learning that the layman is deemed incapable of directing him in the practice of his calling. Thus, even salaried medical employees have been held, on the basis of impossibility of control, incapable of occupying the status of servant. Runyan v. Goodrum, 147 Ark. 481, 228 S.W. 397 (1921). *See* 69 A.L.R.2d 322 (1960).

The non-applicability of *respondeat superior* to physician employees apparently had its genesis in Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N. E. 92 (1914). (Nurses carrying out physicians' medical orders, to whose authority they were subject, held not servants of hospital). The New York court distinguished, for purposes of *respondeat superior,* the type of conduct in question. If the duties fell within an area calling upon the professional expertise of the wrongdoer, the right to direct and control professional conduct being absent, *respondeat superior* would not apply. If the conduct fell within the area of administrative or managerial duties, directable by the master in their performance, then *respondeat superior* would apply. Prior to *Schloendorff,* the rule seems to have been broadly accepted that a physician could be the servant or employee of a hospital, and the proposition that the institution became liable under the *respondeat superior* doctrine was accepted in many cases. Brown v. La Societe Francaise De Bienfaisance Mutuelle, 138 Cal. 475, 71 P. 516 (1903); *See* Annot., 69 A.L.R.2d 288 (1960) at 310 for collection of cases holding hospitals liable under the doctrine of *respondeat superior* before and after the 1914 *Schloendorff* opinion. *Schloendorff* was, we believe wisely, overruled in 1957 in Bing v. Thunig, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1951). A number of other jurisdictions have also rejected the *Schloendorff* rule. Moeller v. Hauser, 237 Minn. 368, 54 N.W.2d 639, 57 A.L.R.2d 364 (1952). The California Supreme Court specifically rejected the theory in Rice v. California Lutheran Hosp., 27

Cal.2d 296, 163 P.2d 860 (1945). The California court stated:

"It should be noted that a nurse or physician may be the servant of a hospital, thus requiring the application of the doctrine of respondeat superior even though they are performing professional acts." 163 P.2d at 865.

*See also* Vanaman v. Milford Memorial Hospital, Inc., 272 A.2d 718 (Del.1970); Klema v. St. Elizabeth's Hosp., 170 Ohio St. 519, 166 N.E.2d 765 (1960); Sepaugh v. Methodist Hosp., 30 Tenn.App. 25, 202 S.W.2d 985 (1946).

In *Bing,* an inflammable alcoholic antiseptic fluid, reddish in color, had been swabbed on a patient's back prior to surgery. Hospital nurses, aware that the antiseptic was potentially dangerous, were instructed to see that it did not spill on the linen and to carefully inspect and remove any linen on which the antiseptic may have spilled. The nurses did not discover that sheeting under the patient had become soaked with the fluid, and the patient was severely burned when it caught fire. The hospital attempted to invoke the *Schloendorff* rule, contending that the conduct in controversy occurred during the performance of a medical act. The court noted the difficulty that had been encountered in attempts to apply the rule, and the ensuing confusion resulting from its application, *e. g.* improperly capped hot water bottle placed on patient is administrative, Iacono v. New York Polyclinic Medical School and Hosp., 296 N.Y. 502, 68 N.E.2d 450 (1946); keeping hot water bottle on too long is medical, Sutherland v. New York Polyclinic Medical School and Hosp., 298 N.Y. 682, 82 N.E.2d 583 (1948). Blood transfusion to wrong patient is administrative, Necolayff v. Genesee Hosp., 296 N.Y. 936, 73 N.E.2d 117 (1947); transfusion of wrong blood to right patient is medical, Berg v. New York Society for Relief of Ruptured and Crippled, 1 N.Y.2d 499, 154 N.Y.S.2d 455, 136 N.E.2d 523 (1956). Use of improperly sterilized hypodermic needle is administrative, Peck v. Charles B. Towns Hosp. Inc., 275 App.Div. 302, 89 N.Y.S.2d 190 (1949); improperly administered hypodermic injection is medical, Bryant v. Presbyterian Hosp., 304 N.Y. 538, 110 N.E.2d 391 (1953). Failing to place bed sideboard is administrative, Ranelli v. Society of New York Hosp., 295 N.Y. 850, 67 N.E.2d 257 (1946); when sideboards are needed and the decision to use them is not made, the failure to act is medical, Grace v. Manhattan Eye, Ear and Throat Hosp., 301 N.Y. 660, 93 N.E.2d 926 (1950). The *Bing* court observed:

"From distinctions such as these there is to be deduced neither guiding principle nor clear delineation of policy; they cannot help but cause confusion, cannot help but create doubt and uncertainty. And, while the failure of the nurses in the present case to inspect and remove the contaminated linen might, perhaps, be denominated an administrative default, we do not consider it either wise or necessary again to become embroiled in an overnice disputation as to whether it should be labeled administrative or medical." 163 N.Y.S.2d at 6, 143 N.E.2d at 5.

The court took cognizance of the nurse's independent contractor status under the *Schloendorff* doctrine and her dual status as an employee of the hospital entitled to industrial compensation should she happen to injure herself by the performance of the "medical" act. Bernstein v. Beth Israel Hosp., 236 N.Y. 268, 140 N.E. 694, 30 A. L.R. 598. The court pertinently stated:

"The doctrine of *respondeat superior* is grounded on firm principles of law and justice. Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness.

&ast; &ast; &ast; &ast; &ast; &ast;

The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility.

Hospitals should, in short, shoulder the responsibilities borne by everyone else. There is no reason to continue exemption from the universal rule of *respondeat superior*. The test should be, for these institutions, whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its employees and, if he was, was he acting within the scope of his employment." 163 N.Y.S.2d at 10, 143 N.E.2d at 8.

The *Schloendorff* rule has been further criticized on the basis that if it were followed to its logical conclusion the doctrine of *respondeat superior* would be stultified beyond contemplation. Chemists, engineers and all types of highly skilled individuals should be covered in a consistent application. As the Colorado court noted in Bernardi v. Community Hospital Association, 166 Colo. 280, 443 P.2d 708 (1968):

"If we were to rule that *respondeat superior* does not apply because the hospital is not licensed as a Nurse, then it would seem to follow that an airline should not be liable for the negligence of its pilot because the airline is not licensed to fly an aircraft." 443 P.2d at 713.

Having undertaken one of mankind's most critically important and delicate fields of endeavor, concomitantly therewith the hospital must assume the grave responsibility of pursuing this calling with appropriate care. The care and service dispensed through this high trust, however technical, complex and esoteric its character may be, must meet standards of responsibility commensurate with the undertaking to preserve and protect the health, and indeed, the very lives of those placed in the hospital's keeping. Darling v. Charleston Community Memorial Hosp., 33 Ill.2d 326, 211 N.E.2d 253 (1965)

In claiming a master-servant relationship between Dr. Rente and Tucson General, appellants argue the following: Elly Beeck never communicated with Dr. Rente, directly or indirectly, to arrange for his services. His services were given entirely because of his status as hospital radiologist. Dr. Rente's contract with Tucson General provides that he is "co-chairman" of the hospital's x-ray department, and he, in actuality, is an employee of the hospital.

Dr. Rente, and his "equal partner" Dr. Robert Kring, osteopathic doctors specializing in radiology, entered into a written agreement with appellee, Tucson General Hospital, to perform professional medical services in their particular specialty for the hospital from and after May 1, 1967, for a five year term. They became co-chairmen of the Tucson General Hospital department of radiology, one of several departments of staff-member doctors at the hospital. The hospital paid the doctors 33⅓% of 95% of the gross revenue of the x-ray department. The payments were to be calculated and made on a calendar month basis. The hospital billed for the radiologists' services. The doctors received no other compensation and agreed not to engage in private practice during the term of the agreement with the exception that they could assist

Spencer C. Hilton, D. O. in his practice when Dr. Hilton was vacationing or ill, provided the efficient operation of the x-ray department was not affected.

Drs. Rente and Kring were permitted a month's vacation each, not to be taken concurrently. They were each allotted reasonable time to attend professional conventions and meetings. The doctors were to provide their own insurance coverage for malpractice, and they were ". . . to comply with the policies, rules and regulations of [the hospital] . . . and the American Osteopathic Association." The doctors were given the right to associate similarly qualified radiologists, but stood responsible to compensate such associates. The hospital and the doctors reserved the right to terminate the agreement upon 120 days' prior written notice. The hospital owned the equipment, bought the supplies and provided the technicians who assisted the radiologists.

The radiology department of Tucson General was operated virtually on a monopoly basis. Dr. Rente and his colleagues were the only ones authorized to perform x-ray work for the department. Any choice by Mrs. Beeck was eliminated. The hospital had chosen for her. It had placed the "hospital radiologists" in the position of exclusive radiologists for the hospital. Further, the hospital furnished everything. The equipment belonged to the hospital and the radiologist paid no rent for use of the equipment or for space at the hospital. Working hours, vacation time, billing and employment of technicians were all controlled by the hospital. The radiology services were obviously furnished under the auspices of Tucson General. Clearly the hospital could regulate operation of its x-ray department to the extent of requiring that the descent-arresting stop be in place before undertaking the type of procedure in question here. Checklists are commonly used in operating complicated equipment. Furthermore, it is well known that hospitals undertake control of the highly technical service with which they deal through overseeing boards and supervisors and peer group mechanisms of various types.[1] Purcell v. Zimbelman, 18 Ariz.App. 75, 500 P.2d 335 (filed July 20, 1972).

Mrs. Beeck was given no choice respecting the radiologist who would perform the x-rays, the choice was completely the hospital's. Further, the hospital had the right to control the standards of performance of this chosen radiologist. The radiologist was employed by the hospital for an extended period of time (five years) to perform a service which was an inherent function of the hospital, a function without which the hospital could not properly achieve its purpose. All facilities and instrumentalities were provided by the hospital together with all administrative services for the radiology department.

Based upon all the previously mentioned reasons, we hold that an employee-employer relationship existed between Dr. Rente and the hospital and the doctrine of

---

1. Subsequent to the occurrence in the case *sub judice* the legislature has imposed upon a hospital the duty to police the activities of its physicians by amending A.R.S. § 36–445 as follows:
   "§ 36–445. Review of certain medical practices; confidential
   The governing body of each licensed hospital shall require that physicians admitted to practice in the hospital organize into committees to review the professional practices within the hospital for the purpose of reducing morbidity and mortality and for the improvement of the care of patients provided in the institution. Such review shall include the nature, quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital. Such review need not identify the patient or doctor by name but may use a case number or some other such designation." Added Laws 1971, Ch. 203, § 1.

*respondeat superior* applies. Appellants' question whether the hospital is liable under the doctrine of *respondeat superior* for acts of the x-ray technician has become moot in light of our ruling.

When Mrs. Beeck entered the hospital she signed a document entitled "CONDITIONS OF ADMISSION." It contained the following which appellee stressed in the trial court:

"2. MEDICAL AND SURGICAL CONSENT:

The patient is under the control of his attending physicians and the hospital is not liable for any act or omission in following the instructions of said physicians, and the undersigned consents to any x-ray examination, laboratory procedures, anesthesia, medical or surgical treatment or hospital services rendered the patient under the general and special instructions of the physician. The undersigned recognizes that all doctors of medicine furnishing services to the patient, including the radiologist, pathologist, anesthetist and the like are independent contractors and are not employees or agents of the hospital."

Appellants point out that Mrs. Beeck is a native of Germany, was a long time resident there and has difficulty understanding English. Her deposition would seem to verify that this truly is the case. Secondly, unless the radiologist were actually an independent contractor the clause reciting him to be so is of no effect. See Annot. 6 A.L.R.3d 704 (1966), as supplemented (1971).

For the reasons given, the judgment is reversed and the case remanded for further proceedings consistent with this opinion.

KRUCKER, C. J., and HOWARD, J., concur.