206 P.3d 790

**MIDTOWN MEDICAL GROUP, INC. dba
Priority Medical Center, Inc., Plain-
tiff/Appellee/Cross–Appellant,**

v.

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE CO.; Steven D. Smith, De-
fendants/Appellants/Cross–Appellees.**

No. 1 CA–CV 07–0501.

Court of Appeals of Arizona,
Division 1, Department A.

Dec. 23, 2008.

Review Denied April 20, 2009.

Eleanor L. Miller, Phoenix, Attorney for Plaintiff/Appellee/Cross–Appellant.

The Cavanagh Law Firm By Steven D. Smith, Christopher Robbins, Phoenix, Attorneys for Defendant/Appellant/Cross–Appellee Steven D. Smith.

Manning & Marder, Kass, Ellrod, Ramirez By Pari K. Scroggin, Scottsdale, Attorneys for Defendant/Appellant/Cross–Appellee State Farm Mutual.

## OPINION

BARKER, Judge.

¶ 1 The primary question in this matter is whether an "outpatient treatment center" as described in Arizona Revised Statutes ("A.R.S.") section 36–405(B)(1) and Arizona Administrative Code ("A.A.C.") R9–10–101(39), which employs physicians and chiro-

practors, may be owned by persons who are not licensed physicians or chiropractors. For the following reasons, we affirm the trial court's decision that the ownership structure of such an entity is statutorily permitted.

## I.

¶ 2 Midtown Medical Group, Inc., doing business as Priority Medical Center, Inc. ("the Center"), is incorporated as a general corporation in Arizona and is owned solely by Jacob Kost, who is an engineer and is not licensed to practice medicine or chiropractic.[1] Kost is responsible for most of the day-to-day administrative activities at the Center. The Center employs on a part-time basis doctors and chiropractors who have no ownership interest in the clinic. The doctors do not have any duties or responsibilities involving billing or regarding the price charged for services. It is undisputed, however, that all medical and chiropractic services are provided by individuals who are licensed in their particular field.

¶ 3 A number of insurance companies refused to reimburse injured persons treated by the Center. The insurance companies claimed that the Center was not legally licensed under Arizona law. As a result, the Center sent a number of letters to the insurance companies and their lawyers, including one to Steven D. Smith, who was counsel for State Farm Mutual Automobile Insurance Company ("State Farm"). The letters attached a copy of the license that had been issued to the Center by the Arizona Department of Health Services and requested that the insurance companies and their lawyers cease and desist from disseminating information that the Center was unlicensed or conducting business illegally. The Center also attempted unsuccessfully to intervene in a number of lawsuits between the insurers and the injured persons. Finally, the Center filed a declaratory action, seeking an order that the Center "is a duly licensed 'outpatient treatment center' pursuant to Arizona law ... and, as such, is not conducting its business 'illegally' in the State of Arizona."

1. Though there may be a factual dispute about exactly who owns the Center, it is undisputed that no owner has received any medical training.

¶ 4 After a prior appeal in which this controversy was determined to be justiciable, *Midtown Med. Group, Inc. v. Liberty Assurance Co. of Boston,* 1 CA–CV 05–0045 (Ariz. App. Jan. 19, 2006) (mem.decision), the parties filed cross-motions for summary judgment regarding whether the Center was authorized to provide medical and chiropractic services in Arizona and permitted to recover fees for those services. The trial court found that "plaintiff's licensed health care institution is lawfully organized pursuant to the laws of Arizona" and granted summary judgment for the Center. In doing so, the trial court determined that the "corporate practice doctrine" announced by the Arizona Supreme Court in *Funk Jewelry Co. v. State ex rel. La Prade,* 46 Ariz. 348, 50 P.2d 945 (1935), and *State ex rel. Board of Optometry v. Sears, Roebuck & Co.,* 102 Ariz. 175, 427 P.2d 126 (1967), had been modified by subsequent legislative pronouncements. However, the trial court denied the Center's request to enjoin State Farm from alleging in any judicial proceeding that the Center is not lawfully licensed. The trial court also denied the Center's request for attorneys' fees.

¶ 5 State Farm and Smith timely appeal. The Center timely cross-appeals. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

## II.

¶ 6 On appeal, State Farm and Smith jointly argue that the statutory licensing scheme for physicians and chiropractors prohibits lay persons from owning an "outpatient treatment center." They also contend that the Center is practicing medicine in violation of the corporate practice of medicine doctrine set forth in the *Funk Jewelry* and *Sears* cases. Accordingly, they argue the Director of the Department of Health Services ("Director") erred in awarding the Center a license to operate. We disagree with both arguments.

¶ 7 We turn first to the language of the statutes under which the Center was licensed, as they are the most reliable indicator of the legislature's intent. *Obregon v. Indus. Comm'n,* 217 Ariz. 612, 614, ¶ 11, 177 P.3d 873, 875 (App.2008) ("We look first to the language of the statute as the most reliable indicator of its meaning."). We then address related statutory provisions and the corporate practice of medicine doctrine. As the questions presented are ones of law, we review them de novo. *Saenz v. State Fund Workers' Comp. Ins.,* 189 Ariz. 471, 473, 943 P.2d 831, 833 (App.1997) (explaining that *de novo* review is applied when reviewing questions of law decided by the trial court in a summary judgment action).

## III.

¶ 8 The legislature has delegated the licensing of health care institution[2] to the Director under A.R.S. § 36–405 (Supp.2007).[3] As part of that delegation of authority, the legislature provided as follows:

█ The director may, by rule:

1. Classify and subclassify health care institutions .... Classes of health care institutions may include hospitals, infirmaries, *outpatient treatment centers*, health screening services centers and residential care facilities.

*Id.* (B)(1) (emphasis added). Thus, in accordance with this rule-making authority, the Director has specified that an "[o]utpatient treatment center" is a class of a "health care

---

**2.** "Health care institution" is defined to include "every place, institution, building or agency, whether organized for profit or not, that provides facilities with medical services, nursing services, health screening services, other health-related services, supervisory care services, personal care services or directed care services and that includes home health agencies as defined in § 36–151 and hospice service agencies." A.R.S. § 36–401(A)(20) (Supp.2007) (formerly subsection (23), renumbered subsection (20) by 2008 Ariz. Sess. Laws, ch. 270, § 1 (2d Reg.Sess.), effective September 26, 2008).

**3.** "The director shall adopt rules to establish minimum standards and requirements for the ... licensure of health care institutions necessary to assure the public health, safety and welfare." A.R.S. § 36–405(A). Subsection (B) explicitly authorizes the Director to "[p]rescribe standards for determining a health care institution's substantial compliance with licensure requirements" and to "[p]rescribe the criteria for the licensure inspection process." A.R.S. § 36–405(B)(2), (3).

institution," A.A.C. R9–10–101(39), and that a "person" may apply for such a license, A.A.C. R9–10–102(A)(16). "Person," as used in this rule, is defined by A.A.C. R9–10–101(43) to have "the same meaning as in A.R.S. § 1–215." That definition "includes a *corporation*, company, partnership, firm, association or society, as well as a natural person." A.R.S. § 1–215(29) (Supp.2008) (emphasis added). Thus, the plain language of the rule clearly authorizes a corporation to be licensed as an "outpatient treatment center." Neither does it require that a "natural person" hold a professional license to obtain a license for such an entity.

¶ 9 There is no statutory definition as to what constitutes an "outpatient treatment center." That term is defined by rule to mean "a health care institution class without inpatient beds that provides medical services for the diagnosis and treatment of patients." A.A.C. R9–10–101(39). The statutory definition of "medical services," under which the administrative rule was adopted, is the services that pertain to medical care and that are performed at the direction of a physician on behalf of patients by *physicians*, dentists, nurses and other professional and technical personnel." A.R.S. § 36–401(A)(28) (emphasis added). "Treatment" under the rule is defined as a "procedure or method to cure, improve, or palliate an injury, an illness, or a disease." A.A.C. R9–10–101 (59). Thus, it is absolutely clear that the Director understood that "outpatient treatment centers" would provide medical care "by physicians."

¶ 10 The legislature also charged that the Director "*shall adopt* rules to establish minimum standards and requirements for the ... licensure of health care institutions necessary to assure the public health, safety and welfare." A.R.S. § 36–405(A) (emphasis added). Of course, these rules must comply with the statutory scheme. *Kaman Aerospace Corp. v. Ariz. Bd. of Regents*, 217 Ariz. 148, 155, ¶ 29, 171 P.3d 599, 606 (App.2007) (" 'The same principles of construction that apply to statutes also apply to administrative rules and regulations,' and a public entity's regulations, if consistent with its statutory scheme, 'are entitled to be given the force and effect of law.' ") (quoting *Kimble v. City of Page*, 199 Ariz. 562, ¶ 19, 20 P.3d 605, 608 (App.

2001), and *Civil Serv. Comm'n of Tucson v. Foley*, 75 Ariz. 364, 368–69, 257 P.2d 384, 387 (1953)). In this regard, the pertinent statute provides for an application process to become a licensed health care institution. A.R.S. § 36–422(B) (Supp.2007). It provides:

An application filed pursuant to this section shall be signed as follows:

1. If the applicant is an individual, by the owner of the health care institution.

2. If the applicant is a partnership or corporation, by two of the partnership's or corporation's officers.

*Id.* Nowhere is there a statutory requirement in the application provisions that the individual owner be a licensed physician or health care provider or that the corporation identified be a professional corporation. Neither did the Director, in the discharge of the duty to promulgate rules "to assure the public health, safety and welfare," A.R.S. § 36–405(A), deem it necessary to require that those owning an "outpatient treatment center" be licensed to practice in a health care related field.

¶ 11 We additionally note that the statutory scheme as to health care institutions, while not requiring that owners of "outpatient treatment centers" have licenses to practice medicine, makes plain the contrary legislative intent that owners of such institutions will in fact not be licensed by the governing body of the health care field in which the "outpatient treatment center" provides services. In A.R.S. § 36–402(A)(3) (Supp.2007), the legislature provided the following exemption from licensure as a "health care institution":

This chapter and the rules adopted by the director pursuant to this chapter do not authorize the licensure, supervision, regulation or control of:

. . . .

3. Private offices and clinics of health care providers licensed under Title 32 [the licensing statute for physicians]. . . .

Accordingly, if a physician owns a private office or clinic that is providing services such as those specified for an "outpatient treatment center," the licensed physician need not

seek licensure from the Director. Indeed, the typical physician's office is a virtual parallel to the definition of an "outpatient treatment center": an entity "without inpatient beds that provides medical services for the diagnosis and treatment of patients." A.A.C. R9–10–101(39). This leads to the inescapable conclusion that the intent of the licensing statutes and regulations providing for "outpatient treatment centers" was to expressly regulate and permit what State Farm and Smith would seek to preclude: the ownership of such an entity by persons (whether individual or corporate) who themselves do *not* hold a license to practice in the medical or health care field for which "medical services" are provided.

¶ 12 Thus, we conclude that the plain language of the governing statute and regulations pertaining to "outpatient treatment centers" (1) does not require that an owner be separately licensed in the health care field involved and (2) expressly permits general corporate ownership. Of course, this does not suggest, nor does the Center contend, that individuals providing services at an "outpatient treatment center" need not be duly licensed in the field in which they are practicing. Here, however, there is no contention that the persons providing services were not separately licensed as required.

## IV.

### A.

■ ¶ 13 State Farm and Smith argue that our statutory interpretation does not take into account the statutes pertaining to corporations (whether general or professional) and the licensing statutes pertaining to physicians. They argue that when this broader statutory framework is considered, Title 36 must be read to preclude ownership by persons other than a professional corporation, individuals licensed in the particular field, or a collection of such licensed individuals practicing in one of the specified business forms (i.e. partnership, corporation). We disagree.

### B.

¶ 14 State Farm and Smith argue that "a general corporation itself cannot practice a profession" because it "does not possess the necessary moral and intellectual qualities to obtain a license." (Internal quotation marks omitted.) Under their view, the only type of corporation that is licensed to practice medicine is a professional corporation where at least 51% of the corporation is held by licensed professionals, per A.R.S. § 10–2220 (2004), or "when the licensed person is 100% owner of a general corporation."

■ ¶ 15 The initial problem with this argument is that in neither circumstance that State Farm and Smith cite is the corporation itself actually licensed to practice medicine.[4] A professional corporation does not somehow magically transfer the licenses of the individuals who own it to the corporate body as a whole. A license to practice medicine only applies to the individual to whom it is issued. A.R.S. § 10–2213(A) (2008) ("A domestic or foreign professional corporation may render professional services in this state *only through individuals licensed* in this state to render the services.") (emphasis added). The concept that Physician A's license would give Layperson B the right to practice medicine because B holds 49% of a professional corporation is patently false. A.R.S. § 32–1455(A)(1) (2008) (making it a class 5 felony to practice medicine when "a person [is] not licensed or exempt from licensure pursuant to this chapter"). A professional corporation does not create a group license to practice medicine; it is merely an organizational mechanism that provides a recognized business form for those so licensed to practice their specified healing art.

---

**4.** The "practice of medicine" is defined to mean "the diagnosis, the treatment or the correction of or the attempt or the claim to be able to diagnose, treat or correct any and all human diseases, injuries, ailments, infirmities, deformities, physical or mental, real or imaginary, by any means, methods, devices or instrumentalities, except as the same may be among the acts or persons not affected by this chapter. The practice of medicine includes the practice of medicine alone or the practice of surgery alone, or both." 2008 Ariz. Sess. Laws, ch. 12, § 1 (2d Reg.Sess.) (updating the definition found in A.R.S. § 32–1401(22) (2008)).

¶ 16 The requirements for obtaining a license to practice medicine demonstrate that they apply only to a natural person, and not a corporation (professional or otherwise). An applicant must "[g]raduate from an approved school of medicine," successfully "complete an approved twelve month hospital internship, residency or clinical fellowship program," and have "the physical and mental capability to safely engage in the practice of medicine." A.R.S. § 32–1422 (2008).[5] Similarly, to obtain a license to practice chiropractic, an individual must be "a person of good character and reputation," graduate from "a chiropractic college," be "physically and mentally able to practice chiropractic skillfully and safely," and pass an examination. A.R.S. § 32–921(B) (2008). Arizona statutes specifically limit medical and chiropractic licenses to natural persons. A.R.S. § 32–1401(10) (2008) (defining "doctor of medicine" as "a *natural person* holding a license, registration or permit to practice medicine pursuant to this chapter") (emphasis added);[6] A.R.S. § 32–900(4) (2008) (defining a "doctor of chiropractic" as "a *natural person* who holds a license to practice chiropractic pursuant to this chapter") (emphasis added).

¶ 17 Related statutes further support the concept that only natural persons may be licensed to practice medicine because they rely on concepts that have no application to corporations. For example, A.R.S. § 32–1403(A)(1) (2008) allows the medical board to order and evaluate "physical, psychological, psychiatric and competency testing of licensed physicians and candidates for licensure as may be determined necessary by the board."[7] Similarly, A.R.S. § 32–1430(A) (2008) provides that "[e]ach person holding an active license to practice medicine in this state shall renew the license every other year on or before the licensee's birthday."[8]

¶ 18 Thus, the argument that while a professional corporation can "practice medicine," a general corporation cannot is flawed by its foundational premise: Neither a professional corporation nor a general corporation "practices medicine." Only licensed individuals who comply with the statutory licensing scheme under Title 32, described in part above, may "practice medicine."

### C.

¶ 19 We address further State Farm and Smith's argument that a general corporation that provides medical services must be 100% owned by a licensed professional. They base their argument on A.R.S. § 10–2213(C). That statute provides:

> Nothing contained in this chapter alters the right of persons licensed to engage in the rendering of a professional service from rendering a professional service, and those persons may render a professional service, in any other business form or entity, including a corporation incorporated under a general law of this state other than this chapter, unless the use of the form or entity is expressly prohibited by the licensing law of this state applicable to the profession or by the licensing authority with jurisdiction over the profession.

*Id.*

¶ 20 State Farm and Smith's interpretation of § 10–2213(C) is that the ability to "render a professional service[ ] in any other business form or entity, including a corporation incorporated under a general law of this state" is limited to an association of "persons licensed" to engage in the professional field in question. Whether this reading is correct or not as to corporations generally we need not decide. The issue before us is whether a corporation *licensed by the Director* to act as an "outpatient treatment center" can so act. The legislature or the Director in Title 36

---

5. This section was recently amended by 2008 Ariz. Sess. Laws, ch. 123, § 1 (2d Reg.Sess.); however, none of the changes are material to our analysis.

6. This section was recently amended by 2008 Ariz. Sess. Laws, ch. 12, § 1 (2d Reg.Sess.); however, none of the changes are material to our analysis.

7. This statute has been held unconstitutional to the extent it permits warrantless searches of abortion clinics. *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir.2004).

8. This section was also recently amended by 2008 Ariz. Sess. Laws, ch. 123, § 2 (2d Reg. Sess.); however, none of the changes are material to our analysis.

and the accompanying regulations could easily have imposed the requirement that there be no corporate owners of "outpatient treatment centers" had they chosen to do so. They did not. In fact, as our analysis above shows, the legislature's and the Director's determination was exactly the opposite. They provided for corporations to be owners of such entities without any requirement that the natural persons forming, directing, or owning the entity be licensed under Title 32 (or other licensing statutes).

¶ 21 As referenced earlier, the statute governing the application requirements for health care institutions (and which applies to "outpatient treatment centers" via A.A.C. R9–10–102(A)(16)) does not require ownership by persons who are professionally licensed. A.R.S. § 36–422. It merely requires "an affirmation that none of the controlling persons has been denied a license or certificate issued by a health profession regulatory board." A.R.S. § 36–422(A)(4). Moreover, the Center's license application that is part of the record reveals that although applicants are asked questions regarding management and the governing authority, they are not asked by the Director whether management or the governing authority is licensed to practice medicine.

¶ 22 Against this backdrop, we decline to judicially engraft an additional requirement that the legislature and the Director have rejected. When construing statutes, we seek to harmonize them. *In re Stephanie N.*, 210 Ariz. 317, 320, ¶ 17, 110 P.3d 1280, 1283 (App.2005) ("We must consider all pertinent statutory provisions in reaching a decision, and related statutes must be interpreted consistently and harmoniously with one another.") (citation omitted). We do not seek to create conflicting provisions with the result that the judiciary adds elements the legislature could have easily required but did not. *Cohen v. State*, 121 Ariz. 6, 9, 588 P.2d 299, 302 (1978) ("[C]ourt[s] should avoid legislating a particular result by judicial construction."); *State ex rel. Lassen v. Harpham*, 2 Ariz.App. 478, 487, 410 P.2d 100, 109 (1966) (concluding that the court could not "judicially legislate" by adding a "good faith" provision to the statute).[9]

### D.

¶ 23 Our examination of Arizona licensing statutes for physicians and chiropractors also

---

**9.** State Farm and Smith do not assert A.R.S. § 10–3301 (2004) as a basis for their position. Accordingly, any such argument has been waived. *Carrillo v. State*, 169 Ariz. 126, 132, 817 P.2d 493, 499 (App.1991) ("Issues not clearly raised and argued on appeal are waived."). That section provides that a nonprofit corporation "shall have the purpose of engaging in and may engage in any lawful activity including the practice of medicine as defined in § 32–1401 ... provided that the corporation engages in the practice of medicine or dentistry only through individuals licensed to practice in this state." The argument could have been asserted that by expressly permitting nonprofit corporations to "engag[e] in the practice of medicine ... through individuals licensed to practice" the legislature was precluding a general corporation from doing so. *See Sw. Iron & Steel Indus., Inc. v. State*, 123 Ariz. 78, 79, 597 P.2d 981, 982 (1979) ("The principle of [e]xpressio unius est exclusio alterius as used in statutory and administrative rule construction means that the expression of one or more items of a class and the exclusion of other items of the same class implies the legislative intent to exclude those items not so included."). Had this argument been made and not waived, we would have rejected it. As set forth at length above, *supra* Parts III–IV(C), there is a more specific statutory and regulatory scheme for "outpatient treatment centers." The issue before us is not whether a *general* corporation—whether profit or nonprofit—has such restrictions but whether a corporation *licensed by the Director* to act as an outpatient treatment center can so act. *See supra* ¶ 20. As described in Parts IIIIV(C), the legislature and the Director expressly so provided. Here, where the legislature and the Director have made a more specific legislative and administrative pronouncement as to outpatient treatment centers, that more specific pronouncement applies and controls. *See Knape v. Brown*, 86 Ariz. 158, 161, 342 P.2d 195, 197 (1959) ("[I]t is a well recognized rule of statutory construction that where special provisions of a statute deal with the same subject as a general statute, the special provision prevails."); *Mercado v. Superior Court*, 51 Ariz. 436, 441, 77 P.2d 810, 812 (1938) ("[W]here ... there are two provisions applicable to the same subject, one general in its scope and the other covering a limited portion only of the subject included in the general one, the special statute is to be considered as governing the exception, while the general statute applies only to matters not included in the special one."). We address A.R.S. § 10–3301 solely for the purpose of completeness.

reveals nothing that specifically prohibits a doctor from being *employed* by (as contrasted with having the doctor's medical decisions being *influenced* by) a layperson or general corporation. The statutes spell out in excruciating detail the types of behavior that are unacceptable for doctors and chiropractors. They do not list being employed by a layperson or general corporation as a type of prohibited behavior. A.R.S. § 32–1401(27)(a)–(uu) (listing no less than forty-seven specific types of "unprofessional conduct" applicable to physicians); [10] A.R.S. § 32–924(A)(1)–(28) (2008) (listing twenty-eight specifically prohibited types of behavior applicable to chiropractors).

¶ 24 Although case law is sparse on this issue, *Beeck v. Tucson General Hospital*, 18 Ariz.App. 165, 500 P.2d 1153 (1972), held that a doctor could be an employee of a hospital and that the hospital was therefore subject to *respondeat superior* liability. In *Beeck*, the court explicitly rejected the notion that "[t]he physician's vocation is viewed in some cases as requiring such high skill and learning that the layman is deemed incapable of directing him in the practice of his calling." 18 Ariz.App. at 167, 500 P.2d at 1155. Instead, it quoted from *Bing v. Thunig*, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3, 8 (1951), that hospitals "regularly employ on a salary basis a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment." 18 Ariz.App. at 169, 500 P.2d at 1157. In a statement that is very analogous to this case, the court quoted a Colorado case as follows: " 'If we were to rule that *respondeat superior* does not apply because the hospital is not licensed as a Nurse, then it would seem to follow that an airline should not be liable for the negligence of its pilot because the airline is not licensed to fly an aircraft.' " *Id.* (quoting *Bernardi v. Cmty. Hosp. Ass'n*, 166 Colo. 280, 443 P.2d 708 (1968)). As this statement demonstrates and as we have set forth earlier, *supra* ¶¶ 15–17, only natural persons may be licensed to practice medicine, but the employing entity will be liable for any negligent acts by the licensed person in the course of the patient's treatment pursuant to *respondeat superior*.

¶ 25 While State Farm and Smith claim that the Center is different from a hospital, for purpose of this analysis, they do not direct us to any specific statute that authorizes a hospital, but not an outpatient treatment center, to employ a physician. State Farm and Smith's argument that hospitals should be treated differently because they are "subject to other stringent statutory standards and agency regulations," citing to A.R.S. §§ 36–425 *et seq.*, fails because "outpatient treatment centers" are also "health care institutions" (as described above) and are also subject to regulatory supervision by a legislatively designated authority (the Director).

### E.

¶ 26 Although State Farm and Smith also claim that "Arizona law bars a general corporation from dividing its business into two departments: business and the practice of medicine," the legislature explicitly distinguishes business from medicine, if you will, in what a licensed practitioner must do and what may be done by others. The following tasks may be performed "[w]ithout the direct supervision of a doctor of medicine": "[b]illing and coding," "[v]erifying insurance," "[m]aking patient appointments," and "[s]cheduling." A.R.S. § 32–1456(C) (2008). Another statute specifically exempts from the practice of medicine licensing scheme "[a]ctivities or functions which do not require the exercise of a doctor of medicine's judgment for their performance." A.R.S. § 32–1421(A)(6) (2008).

¶ 27 Likewise, the American Medical Association("AMA") Principles of Medical Ethics have been adjusted to permit physicians to practice in a greater variety of business structures consistent with the lack of any restriction as to corporate ownership of an outpatient treatment center. Principle VI of the AMA Principles of Medical Ethics states that "[a] physician shall, in the provision of appropriate patient care, except in emergen-

---

**10.** This section also was amended recently by 2008 Ariz. Sess. Laws, ch. 12, § 1 (2d Reg.Sess.); however, no changes are material to our analysis.

cies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care." American Medical Association, *Principles of Medical Ethics* (2001), *available at* http://www.ama-assn.org/ama/pub/category/2512.html.

¶ 28 This principle was originally adopted in 1980 in response to an antitrust suit filed by the Federal Trade Commission ("FTC") in 1979. Nicole Huberfeld, *Be Not Afraid of Change: Time to Eliminate the Corporate Practice of Medicine Doctrine,* 14 Health Matrix 243, 255–56 (2004) (citing *In re Am. Med. Ass'n,* 94 F.T.C. 701, 1018 (1979)). The AMA's principles had previously provided that "[a] physician should not dispose of his services under terms or conditions which tend to interfere with or impair the free and complete exercise of his medical judgement and skill or tend to cause a deterioration of the quality of medical care." American Medical Association, *Principles of Medical Ethics* § 6 (1958), *available at* http://www.ama-assn.org/ama/upload/mm/369/1957_principles.pdf. We would certainly not choose a rule that would "tend to cause a deterioration of the quality of medical care." *Id.* The FTC determined that the old rule, based on the corporate practice of medicine doctrine, was inherently anti-competitive because it prevented physicians from adopting " 'more economically efficient business formats in particular situations' " that would still enable a physician to practice medicine without that physician's medical judgment being impaired. Huberfeld, *supra,* at 255 (quoting *In re Am. Med. Ass'n,* 94 F.T.C. at 1018). Accordingly, the FTC ordered the AMA to modify the ethical restrictions to comply with federal antitrust laws. *Id.*

## V.

¶ 29 State Farm and Smith also urge that the prohibition against the corporate practice of medicine established in our case law mandates that the owner of an "outpatient treatment center" may not be a general corporation owned by individuals not licensed under Title 32. Again, we disagree.

¶ 30 In *Funk Jewelry Co. v. State ex rel. La Prade,* 46 Ariz. 348, 50 P.2d 945 (1935), the court reasoned that the inability of a corporation to obtain a license to operate a store that employed an optometrist made such a practice illegal. 46 Ariz. at 351, 50 P.2d at 946. Because "[t]he defendant company could not conduct a business without a license" and the state had "the right to exclude any individual from practicing such profession unless he had met the statutory qualifications and obtained a license from the state," the court concluded that the defendant "is violating the law regulating optometry" by operating a store without such a license. *Id.* (citations omitted) (internal quotation marks omitted).

¶ 31 In *State ex rel. Board of Optometry v. Sears, Roebuck & Co.,* 102 Ariz. 175, 427 P.2d 126 (1967), the court relied upon and reaffirmed its holding in *Funk* but approved an arrangement whereby an optometrist was leasing space in a Sears store. Relying on *Funk,* the court held that a corporation cannot "practice optometry through employing a licensed optometrist, or through entering into any type of arrangement with a licensed optometrist which subjects the optometrist to the corporation's direction and control." 102 Ariz. at 177, 427 P.2d at 128. In the *Sears* case, the Arizona Supreme Court approved the arrangement because Sears exercised no control over the optometrist and there was no creation of "an employment relationship." *Id.* at 178, 427 P.2d at 129.

¶ 32 There is a fundamental difference between *Funk* and *Sears* and the matter before us. In both *Funk* and *Sears,* the state licensing agency (or Attorney General) sought to preclude the arrangements entered into by the licensed individuals. The Arizona Supreme Court was presented with a situation where the licensing agency, or its legal designee, took the position that legislation regulating the practice of optometry prohibited a corporate entity from employing an optometrist to provide those services. *Funk,* 46 Ariz. at 350, 358, 50 P.2d at 945, 949; *Sears,* 102 Ariz. at 176, 427 P.2d at 127. In our case, we are presented with a completely different procedural posture based upon a completely different statutory framework. In the case before us, the legislature has specifically designated that the Director promulgate rules and issue licenses as to "health

care institutions *necessary to assure* the public health, safety and welfare." A.R.S. § 36–405(A) (emphasis added). Not only did the Director in this case not oppose the issuing of the license given to this corporation, the Director expressly approved it. The legislative scheme under which the rules were promulgated, and the rules themselves, specifically provide for a corporation to provide medical services "by physicians." A.R.S. § 36–401(A)(28); *supra* ¶¶ 9–10. It is not a licensing authority that is trying to label the conduct here illegal; rather, it is an insurer that does not wish to pay the costs of the medical and/or chiropractic services provided.

¶ 33 As an intermediate appellate court, our duty is to follow the pronouncements of the Arizona Supreme Court. *McCreary v. Indus. Comm'n,* 172 Ariz. 137, 142, 835 P.2d 469, 474 (App.1992) ("This court is bound to follow the pronouncements of the supreme court."). However, when the legislature has modified the statutory structure upon which such a pronouncement is based, our duty is to follow the law as newly determined by the legislature unless that law is unconstitutional.[11] *See State v. Eichorn,* 143 Ariz. 609, 614, 694 P.2d 1223, 1228 (App.1984) ("[A]ll cases interpreting the [statute] as it existed before the amendment to the present wording of the statute are inapplicable because of the much different wording of the prior statute."); *see also Lavidas v. Smith,* 195 Ariz. 250, 252, 987 P.2d 212, 214 (App.1999) ("[W]e must construe interrelated statutory provisions together, in the context of the overall statutory scheme, and aim to achieve consistency among them."). Based on the statutory and regulatory scheme pertaining to "health care institutions" generally and "outpatient treatment centers" in particular, the holdings of *Funk* and *Sears* do not determine the outcome in this case. In reaching this conclusion, we emphasize that our decision is a narrow one. We have no authority to modify, and do not modify, any portion of *Sears* and/or *Funk.* We likewise make no pronouncements as to the general vitality of the doctrine of the corporate practice of medicine. We address and rule upon only the narrow issue presented to us: that the statutory and regulatory scheme pertaining to "outpatient treatment centers" expressly permits the Director to issue a license to a general corporation whether or not that corporation is owned by individuals with a separate license to practice in the health care field at issue.

## VI.

¶ 34 For the reasons set forth above, we affirm the trial court's conclusion that the Center is legally licensed as an outpatient treatment center pursuant to A.R.S. § 36–405 and related statutes.[12]

CONCURRING: MICHAEL J. BROWN, Presiding Judge, and MICHAEL R. McVEY, Judge.*

---

**11.** There are no constitutional issues raised in this case.

**12.** The Center also cross-appealed the superior court's rulings denying it injunctive relief and attorneys' fees. The injunctive relief sought was to prohibit State Farm and Smith from asserting in any legal proceeding that the Center was not lawfully licensed. That request is now moot based on the issuance of this opinion. As to the attorneys' fees issues, we see no abuse of discretion and affirm. We also deny attorneys' fees on appeal but award the Center its costs upon compliance with the applicable rule.

* NOTE: The Honorable Michael R. McVey, Judge of the Maricopa County Superior Court, has been authorized to participate in the disposition of this appeal by the Chief Justice of the Arizona Supreme Court pursuant to Article 6, Section 3 of the Arizona Constitution and A.R.S. §§ 12–145 to –147 (2001).