NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

BROOKE AMICK, *Plaintiff/Appellant/Cross-Appellee*,

*v.*

BANNER HEALTH, an Arizona Corporation, dba Banner Desert Medical
Center, *Defendant/Appellee/Cross-Appellant*,

and

JOHN I. ISKANDAR, et al., *Defendants/Appellees*.

No. 1 CA-CV 22-0401
FILED 8-15-2023

---

Appeal from the Superior Court in Maricopa County
No. CV2019-011659
The Honorable Daniel G. Martin, Judge

**REVERSED AND REMANDED**

---

COUNSEL

Beale Micheaels Slack & Shughart PC, Phoenix
By John A. Micheaels, K. Thomas Slack, Tracy A. Gromer
*Counsel for Plaintiff/Appellant/Cross-Appellee*

The Checkett Law Firm PLLC, Phoenix
By John J. Checkett, James G. Bennett
*Co-Counsel for Defendant/Appellee/Cross-Appellant*

Jones Skelton & Hochuli PLC, Phoenix
By Eileen Dennis GilBride
*Co-Counsel for Defendant/Appellee/Cross-Appellant*

Crawford & Kline PLC, Tempe
By Bruce D. Crawford
*Co-Counsel for Defendants/Appellees*

Quintairos Prieto Wood & Boyer PA, Scottsdale
By Rita J. Bustos
*Co-Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

Judge Michael S. Catlett delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Michael J. Brown joined.

---

**C A T L E T T**, Judge:

**¶1**         Brooke Amick ("Amick") appeals the superior court's judgment and denial of a motion for new trial after a jury verdict in favor of Dr. John J. Iskandar ("Dr. Iskandar") in this medical malpractice case. Banner Health dba Banner Desert Medical Center ("BDMC") cross-appeals from the court's pretrial grant of partial summary judgment to Amick based on vicarious liability.

**¶2**         We reverse the court's rulings precluding certain testimony from treating physician Dr. David Suber and evidence of a second surgery. We also reverse the court's grant of partial summary judgment to Amick on the issue of vicarious liability.  We remand for a new trial and, in so doing, provide guidance on a negative inference issue.

## FACTS AND PROCEDURAL HISTORY

**¶3**         On August 24, 2017, Amick went to BDMC's emergency room.  Dr. Iskandar, the on-call neurosurgeon, was brought in to treat Amick.   Dr. Iskandar determined that Amick was suffering from ossification of the posterior longitudinal ligament ("OPLL") that had caused narrowing of the cervical canal from the C2 to C6 vertebrae.  Dr. Iskandar diagnosed Amick with severe cervical spinal stenosis (narrowing).  Dr. Iskandar recommended surgical laminectomy—removal

2

of the lamina (back section) — of the C2-C6 spinal vertebrae to relieve spinal cord compression caused by Amick's severe OPLL.

¶4　　　　On August 28, 2017, Dr. Iskandar performed a partial laminectomy of Amick's C2 vertebra and a total laminectomy at C3-C6 to decompress Amick's spinal cord. Dr. Iskandar then installed hardware, including screws and rods, to support Amick's spinal cord. Dr. Iskandar completed surgery at approximately 4:45 p.m.

¶5　　　　After waking up, Amick reported severe incisional pain and an inability to move her extremities. At approximately 6:00 p.m., Dr. Iskandar evaluated Amick, noting sensation in all four extremities and slight movement in her forearms and shoulders. He ordered an emergency CT scan. A radiologist interpreted the CT scan images and authored a report at 6:59 p.m., noting "[s]evere spinal canal stenosis and presumed cervical cord compression at the level of C2-C3[.]"

¶6　　　　Dr. Iskandar also reviewed the CT scan images, noting "CT of C-spine - anatomic alignment with well-decompressed spinal canal. Hardware was intact and in good position." He again examined Amick, whose condition remained unchanged. Dr. Iskandar ordered a consult from neurologist Dr. David Suber to assess Amick for a possible "conversion reaction." But Dr. Iskandar did not place this order on an emergency basis.

¶7　　　　The following morning, more than 12 hours after surgery, Dr. Suber evaluated Amick and ordered further imaging studies on an emergency basis. Later that morning, Dr. Iskandar again evaluated Amick and determined she was a complete quadriplegic. Amick suffered a cardiac arrest and coded. She was resuscitated and admitted to the intensive care unit. Dr. Iskandar documented in Amick's medical records that he discussed concerns with Amick's family about a "spinal cord reperfusion injury." Amick remained in the intensive care unit until September 29, 2017, when she was discharged from BDMC.

¶8　　　　After deciding she wanted a second opinion, on October 5, 2017, Amick was seen by neurosurgeon Dr. Udaya Kakarla. About two weeks later, on October 20, 2017, Dr. Kakarla performed surgery on Amick. Dr. Kakarla documented "residual stenosis" and performed a complete laminectomy at C2 with "the chance of meaningful recovery [being] very slim." Amick did not regain any motor function following the second surgery but reported she regained some sensation of pain.

¶9 Amick filed a lawsuit against Dr. Iskandar, Dr. Suber, BDMC, and others. During discovery, and while still a party, Dr. Suber testified at deposition that if Dr. Iskandar had told him the night of the surgery that Amick was unable to move her extremities and the post-operative CT scan showed severe compression and stenosis at the C2-C3 level, he would have told Dr. Iskandar that Amick "need[ed] neurosurgical attention and [needed] to be taken back for further decompressive surgery." He testified that the decision to take her back to surgery was a neurosurgical decision. He also testified that when he reviewed the CT scan the morning after the surgery, he found that Amick had "persistent, severe spinal canal stenosis at the C2-C3 level and compression" of the cervical cord at that level.

¶10 Amick agreed to dismiss Dr. Suber (and other parties) before the trial, leaving Dr. Iskandar and BDMC as remaining defendants. The superior court granted summary judgment to Amick on her claim that BDMC was vicariously liable for Dr. Iskandar, finding that Dr. Iskandar was BDMC's apparent agent. The court granted partial summary judgment to Dr. Iskandar on a discrete causation issue, concluding that Amick had failed to establish by expert medical testimony that treatment beyond the 6-12-hour post-operative period would have prevented her spinal cord injury.[1] The court, therefore, later precluded Amick from introducing any evidence regarding her second surgery, including Dr. Kakarla's notes.

¶11 The superior court presided over a 15-day jury trial. One of the central issues was the cause of Amick's spinal cord injury. Amick's theory was that her injury was caused by inadequate decompression of her spine because Dr. Iskandar performed only a partial laminectomy of the C2 vertebra. Dr. Iskandar's experts opined that he performed an appropriate partial laminectomy. Still, due to the laminectomies performed on the other areas of the spine, a rush of blood back into Amick's spinal cord overwhelmed it and resulted in what is known as a "reperfusion injury."

¶12 Amick's neurosurgery expert, Dr. Richard Wohns, testified that Dr. Iskandar fell below the standard of care by performing only a partial laminectomy, and that he should have taken Amick back to surgery to complete the laminectomy immediately upon learning of her post-surgical complaints—with or without the results of the emergency CT scan. The jury heard evidence that Dr. Iskandar had a narrow 6–12-hour window of opportunity after surgery to avoid permanent damage to Amick. Dr. Wohns testified that the post-operative CT scan showed severe narrowing in Amick's spine. Amick's causation expert, Dr. Richard Latchaw, also

---

[1] Amick did not appeal this ruling.

testified that the post-operative CT scan showed persisting stenosis and cord deformity. Dr. Iskandar's neurosurgery expert, Dr. Omar Zalatimo, testified that the post-operative imaging did not show continued spinal cord compression but rather showed evidence of a reperfusion injury.

¶13　　During trial, the superior court precluded Amick's counsel from eliciting testimony from Dr. Suber about what he would have done had Dr. Iskandar requested an emergency consult the night of the surgery and what he observed when he reviewed Amick's CT scan. Dr. Suber ultimately testified only that he was not asked to perform an emergency neurology consultation on August 28, 2017 but would have done so if he had been asked, and he would have then reviewed any available imaging studies. And he testified that he performed a non-urgent neurological examination on August 29, 2017, at approximately 7:00 a.m., determining that Amick was completely paralyzed.

¶14　　Amick's friend testified at trial that shortly before Amick's discharge from BDMC, Dr. Iskandar's nurse, Karla Baning, told her "off the record" that Amick's imaging did not support the reperfusion injury theory. Nurse Baning denied this claim at trial.

¶15　　The jury rendered a defense verdict. The superior court entered final judgment and denied Amick's motion for a new trial.

**DISCUSSION**

**I.　Jurisdiction**

¶16　　Following entry of final judgment and the superior court's denial of her motion for new trial, Amick filed a notice of appeal. On July 19, 2022, this Court stayed the appeal because, at the time of final judgment (January 19, 2022), Amick still had a claim pending against a party and the superior court did not sign the ruling denying Amick's motion for new trial. But Amick had settled with the unresolved party on January 28, 2022. This Court, therefore, revested jurisdiction in the superior court to allow it to consider a motion from Amick for a new "signed judgment with Rule 54(c) finality language" and a signed order denying her motion for new trial. This Court ordered that the "stay will be lifted automatically when this court receives the signed Rule 54(c) judgment and signed order."

¶17　　On August 9, 2022, the superior court entered a signed Rule 54(c) judgment and, on August 11, 2022, a signed order denying Amick's motion for new trial. This Court re-instated the appeal.

**¶18** BDMC then asked this Court to dismiss the appeal for lack of jurisdiction, arguing Amick failed to timely appeal the new final judgment the superior court entered on August 9, 2022. BDMC's motion was referred to Chief Judge Cattani, who denied the motion. In so doing, Chief Judge Cattani explained that, because Amick had settled with the sole remaining defendant prior to filing her notice of appeal, "everything was resolved when Plaintiff filed the notice of appeal and only the ministerial tasks of entering a judgment with Rule 54(c) language and a signed order ruling on the motion for new trial remained." BDMC did not file a motion for reconsideration.

**¶19** Instead, BDMC filed an answering brief requesting "reconsideration of a jurisdictional issue" previously raised in its motion to dismiss. BDMC asks us to reconsider Chief Judge Cattani's decision, arguing again that Amick was required to file a second notice of appeal because the superior court entered the original judgment while a claim against a defendant remained pending. We will not do so. Instead, we agree with Chief Judge Cattani that the pertinent date for determining whether something more than a ministerial task remained pending is the date of Amick's notice of appeal—May 25, 2022. As of that date, the trial court had resolved all claims against all parties, and all that remained were the ministerial tasks of entering a 54(c) judgment and a signed order denying Amick's motion for new trial. *See Smith v. Ariz. Citizens Clean Election Comm'n*, 212 Ariz. 407, 415 ¶ 37 (2006) (the "limited exception" for premature appeals applies "if no decision of the court could change and the only remaining task is merely ministerial"); *Tripati v. Forwith*, 223 Ariz. 81, 86 ¶ 22 (App. 2009) (the "notice of appeal, although premature, became effective upon entry of the signed order denying his motion for new trial"). We, like Chief Judge Cattani, conclude that Amick's premature notice of appeal became effective after entry of final judgment and a signed order denying Amick's motion for new trial. We, therefore, have jurisdiction under A.R.S. § 12-120.21(A)(1), A.R.S. § 12-2101(A), and Arizona Rule of Civil Appellate Procedure 9(c).

## II. Exclusion of Evidence

### A. Dr. Suber's Testimony

**¶20** Amick argues the superior court committed reversible error in finding that some of Dr. Suber's testimony was inadmissible under the "One-Expert Rule" and, therefore, limiting the scope of his testimony at trial. Dr. Iskandar argues the court properly excluded the testimony, but

that even if doing so was erroneous, Amick is not entitled to a new trial. We agree with Amick.

**¶21**  Under Arizona Rule of Civil Procedure ("Rule") 26(b)(4)(F)(i), each side is "presumptively entitled to call only one retained or specially employed expert to testify on an issue." This restriction is known, and referred to herein, as the "One-Expert Rule." Whether a party violates "the One-Expert Rule is a mixed question of law and fact." *McDaniel v. Payson Healthcare Mgmt., Inc.*, 253 Ariz. 250, 255 ¶ 14 (2022). As a mixed question, we defer to factual findings but review legal conclusions *de novo*. *Id.*

**¶22**  In *McDaniel*—our supreme court's most recent word on the One-Expert Rule—the court provided guidance on how to differentiate fact and expert witnesses in the medical malpractice context.[2] The court explained that "the dispositive inquiry is whether the treating physicians testified based on their observations and actions in treating [a patient], regardless of whether in explaining their treatment decisions they also offered opinions about the standard of care." *Id.* at 256 ¶ 20. Crucially, "a fact witness may also offer expert opinion testimony without violating the One-Expert Rule when the witness' testimony is based on personal observations and actions." *Id.* at 255 ¶ 20.

**¶23**  No one disputes that Dr. Suber was Amick's treating neurologist and was not retained or specially employed to testify on an issue. At one point, Dr. Suber was a defendant in this action. By the time of trial, Dr. Suber was an adverse witness compelled to attend and provide testimony because of a subpoena from Amick. Thus, Dr. Suber did not qualify as a "retained or specially employed expert" within the text of the One-Expert Rule. *See* Ariz. R. Civ. P. 26(b)(4)(F)(i).

**¶24**  Under *McDaniel*, Dr. Suber's proposed testimony was not inadmissible under any broader understanding of the One-Expert Rule. Dr. Suber would have testified at trial (1) about what he observed when he reviewed Amick's CT scan and (2) what he would have recommended had Dr. Iskandar asked him to perform an urgent consult on August 28, 2017. As to the urgent consult issue, Dr. Suber would have testified that, based on custom and practice, he would have seen Amick that evening. And, based on the CT scan images he eventually reviewed on August 29, 2017, he would have recommended to Dr. Iskandar that Amick immediately go back into surgery to relieve compression of the spinal cord. His proposed

---

[2]  The superior court did not have the benefit of *McDaniel* at the time it made the evidentiary rulings at issue.

testimony is fact witness testimony. Asking a physician to provide custom and practice testimony based on his observations during treatment does not render the testimony expert testimony—*McDaniel* says that a treating physician can provide standard-of-care testimony. *See* 253 Ariz. at 255–56 ¶¶ 20–21. Under *McDaniel*, therefore, Dr. Suber could testify about his observations in treating Amick, and what he would have recommended had he seen her sooner, without violating the One-Expert Rule. *Id.*

¶25 Moreover, it was prejudicial to exclude Dr. Suber's testimony. One of Dr. Iskandar's primary trial theories was that Amick's quadriplegia resulted from reperfusion, not compression. Dr. Suber's excluded testimony is relevant to refuting that theory because he would have testified that she was suffering from compression post-surgery. Dr. Iskandar also theorized that there was nothing he could have done further for Amick until it was too late. Specifically, Dr. Iskandar testified at trial that between 8:00 p.m. on August 28, 2017 and the next morning, there was nothing for him to do for Amick from a neurosurgery perspective. Dr. Suber's excluded testimony could have helped refute that claim in the jury's mind. The jury would hear from Amick's treating neurologist that had Dr. Iskandar requested an urgent consult on August 28, Dr. Suber would have seen Amick that night and recommended additional and immediate surgery. Dr. Iskandar downplays this proposed testimony because Dr. Suber is not a neurosurgeon and could not decide whether additional surgery would occur. But the fact a non-neurosurgeon would have recommended additional surgery furthers Amick's theory that Dr. Iskandar, as a neurosurgeon, should have readily realized on August 28 that additional surgery was necessary.

### B. Second Surgery Evidence

¶26 Amick argues the superior court also improperly excluded all evidence of her second surgery, including Dr. Kakarla's post-operative note that he observed "residual stenosis" during the second surgery. Amick argues evidence of her second surgery was relevant to causation and damages. Dr. Iskandar maintains that evidence of the second surgery was irrelevant based on the superior court's summary judgment ruling on causation, which granted Dr. Iskandar judgment on any theory "that [Amick's] spinal cord injury was reversible more than 6-12 hours after surgery." We agree with Amick here too.

¶27 The court precluded evidence of Amick's second surgery, finding that Dr. Kakarla's description in his post-operative notes was additional expert opinion supporting that Dr. Iskandar failed to do a

complete decompression, causing continued spinal cord compression and quadriplegia. The court believed the second surgery evidence was cumulative to testimony from Amick's retained expert, Dr. Wohns. But there is no dispute that Dr. Kakarla was Amick's treating neurosurgeon and the notes sought to be introduced reflect his personal observations of Amick's spine during surgery. This evidence is not cumulative expert opinion and does not otherwise violate the One-Expert Rule. *See McDaniel*, 253 Ariz. at 255–56 ¶¶ 20–21.

¶28 We also disagree with the notion that the second surgery evidence is irrelevant because of the superior court's (unchallenged) summary judgment ruling on causation. Amick sought to introduce the second surgery evidence, in part, to refute Dr. Iskandar's reperfusion injury theory. The excluded evidence was relevant to help refute that theory. Two months after Amick's first surgery, Dr. Kakarla personally viewed Amick's spine and visualized "residual stenosis." He then performed a complete laminectomy, which supports Amick's theory that Dr. Iskandar was negligent in performing only a partial laminectomy.

¶29 Dr. Kakarla's documentation about the need for a second surgery and what he discovered during that surgery was also relevant to Dr. Iskandar's defense theory that there was nothing additional he could have done after Amick's first surgery. The fact a second treating neurosurgeon concluded that additional decompression surgery was required could lead the jury to conclude that Dr. Iskandar should have realized the same on August 28, 2017, within the 6-12-hour post-operative window of opportunity. Using the evidence in such a manner is not inconsistent with the court's summary judgment ruling on causation—Amick can argue that the stenosis Dr. Kakarla observed was present on August 28 and the surgery he later performed should and could have been performed within the 6-to-12-hour window.

¶30 The second surgery evidence was also relevant to disputed testimony that Nurse Baning confidentially disclosed shortly before Amick's discharge that compression, not reperfusion, was the underlying medical issue. The jury could find the fact that Amick immediately sought a second opinion from a different neurosurgeon, which resulted in a second surgery, supports that the statement was made. The second surgery was also relevant to Amick's damages.

## C.     New Trial

**¶31**          In sum, the superior court erred by precluding Dr. Suber's additional testimony and evidence of Amick's second surgery. Those errors were prejudicial because the evidence excluded was relevant (each in multiple ways) to the claims and defenses in the case. We, therefore, vacate the judgment in favor of Dr. Iskandar and remand for a new trial. *See In re Conservatorship for Hardt*, 242 Ariz. 449, 453 ¶ 17 (App. 2017) (reversing for a new trial based on the erroneous exclusion of evidence under the One-Expert Rule).

## III.     Negative Inference Guidance

**¶32**          Because the issue may arise on remand, we address Amick's argument that the superior court erred in precluding her counsel from arguing a "negative inference" in closing argument based on Dr. Iskandar's decision not to provide standard of care testimony in his own defense.

**¶33**          Under Arizona Rule of Civil Procedure 26(b)(4)(F)(ii), "a defendant in a medical malpractice action may—in addition to that defendant's standard-of-care expert witness—testify on the issue of that defendant's standard of care." While Dr. Iskandar testified at trial, he did not provide standard-of-care testimony, instead relying on expert testimony. At a pre-trial conference, Amick argued that her counsel should be able to comment in closing argument on that decision, and that the jury could, if it chooses, draw a negative inference. Relying on *Gordon v. Liguori*, 182 Ariz. 232, 236 (App. 1995), the superior court ruled that because Dr. Iskandar testified as a fact witness, Amick's counsel could not suggest in closing argument that the jury should draw any inference from Dr. Iskandar's failure to testify as to the standard of care.

**¶34**          If, on remand, Dr. Iskandar does not provide standard of care testimony, Amick's counsel is permitted to draw the jury's attention to that failure and argue all reasonable inferences therefrom, including inferences that are negative for Dr. Iskandar. Of course, Dr. Iskandar's counsel is permitted to respond to those arguments during closing. If, for example, Amick's counsel does not cross-examine Dr. Iskandar on standard of care issues, Dr. Iskandar's counsel is permitted to point that failure out.

**¶35**          Counsel has wide latitude in closing argument to "comment on the evidence and argue all reasonable inferences therefrom." *State v. Zaragoza*, 135 Ariz. 63, 68 (1983). This Court has previously explained that "[t]he general rule" when a party declines to testify "is that a negative inference is appropriate and that no analysis of factors like those described

in *Liguori* is necessary." *Melissa W. v. Dep't of Child Safety*, 238 Ariz. 115, 116–17 ¶ 5 (App. 2015); *see also Orosco v. Maricopa Cnty. Special Health Care Dist.*, 2017 WL 443531, at *2 ¶ 12 (Ariz. Ct. App. Feb. 2, 2017) ("Under Arizona law, the jury may draw a negative inference when a party declines to testify in a civil case."). We think the same holds true when a party testifies on some matters but not others—a party cannot avoid closing argument commentary on missing testimony by taking the stand and selectively discussing *some* relevant matters. The adversarial process demands that one party be permitted to argue to the jury that there were holes in another party's testimony.

¶36 Even if this were a situation requiring analysis of the *Liguori* factors, those factors support that Amick's counsel should have been permitted to comment on Dr. Iskandar's failure to provide standard of care testimony. As a practical matter, Dr. Iskandar was "in the best position to anticipate the content of [his] testimony." *Melissa W.*, 238 Ariz. at 117 ¶ 7. Dr. Iskandar would naturally be expected to provide standard of care testimony if it would be helpful. *See id.* And Dr. Iskandar, as Amick's treating neurosurgeon, certainly could offer unique testimony about how he thinks he met the standard of care during Amick's operation and after. On remand, if Dr. Iskandar fails to provide standard of care testimony, Amick is permitted to comment on that failure during closing argument and suggest to the jury that it should draw a negative inference therefrom (and Dr. Iskandar can then respond accordingly during closing).

## IV. Cross-Appeal

¶37 BDMC cross-appeals the superior court's pretrial grant of partial summary judgment to Amick on her claim that BDMC is vicariously liable for Dr. Iskandar's alleged negligence.[3] The court concluded that Dr. Iskandar was BDMC's apparent agent as a matter of law, and therefore did not address other agency theories. BDMC argues that, at the very least, there were material issues of fact precluding summary judgment on vicarious liability.

¶38 We review *de novo* a grant of summary judgment to determine if the superior court properly applied the law and whether any genuine issues of material facts exist. Ariz. R. Civ. P. 56(a); *Dinsmoor v. City of*

---

[3] The parties stipulated that the only claim against BDMC was for vicarious liability for the alleged negligence of Dr. Iskandar.

*Phoenix*, 251 Ariz. 370, 373 ¶ 13 (2021). We view the record in the light most favorable to BDMC. *Dinsmoor,* 251 Ariz. at 373 ¶ 13.

¶39 We agree with BDMC that there were material issues of fact precluding summary judgment on Amick's apparent and actual agency theories. We conclude that Amick's argument that BDMC owed her a non-delegable duty fails as a matter of law.

## A. Material Facts

¶40 Amick sought medical care by going to BDMC, where Dr. Iskandar was on-call and brought in as a neurosurgical consultant to Amick. Amick was expected to testify that BDMC selected Dr. Iskandar to be her neurosurgeon. Amick disclosed she would testify that "she understood and believed" that Dr. Iskandar was the BDMC in-house neurosurgeon and was employed by and working for BDMC. In deposition testimony, Dr. Iskandar stated BDMC required physicians to always wear a "Banner Health system physician identification badge" while working at the hospital.

¶41 The parties stipulated that, at all relevant times, Dr. Iskandar worked in the course and scope of his employment with East Valley Neurosurgery ("EVN"). The medical services Dr. Iskandar provided to Amick were billed through EVN. And, upon admission to the hospital, Amick signed a "Condition of Admission and Treatment" ("Condition"), which stated in pertinent part:

> The patient will be treated by his/her attending physician, including physician extenders and covering physicians, and be under his/her care and supervision. Physicians and other health care providers furnishing services to the patient . . . are generally not employees or agents of the hospital, and the hospital is not liable for their actions or omissions.

¶42 BDMC created policies and procedures applying to all staff and Dr. Iskandar. Dr. Iskandar testified that BDMC did not dictate or control the clinical care he provided Amick, and that he used his independent judgment in caring for and treating her. Dr. Iskandar, from 2009 to August 2017, performed neurosurgery exclusively at BDMC pursuant to a contract between BDMC and EVN. BDMC paid Dr. Iskandar $3,500 per 24-hour shift to be available (i.e., "on-call") to care for, or consult with, BDMC patients on short notice (usually within 30 minutes). BDMC furnished all operating rooms, equipment, instruments, nurses, staff, and administration necessary for Dr. Iskandar to provide neurological services

to BDMC patients. Dr. Iskandar served on various BDMC hospital committees.

### B. Apparent Agency

**¶43** BDMC argues the superior court erred in concluding that Dr. Iskandar was its apparent agent as a matter of law. A hospital may be liable for a physician's negligence under an apparent agency theory. *See Reed v. Gershweir*, 160 Ariz. 203, 205 (App. 1989). The party asserting agency has the burden of proof. *Curran v. Indus. Comm'n of Ariz.*, 156 Ariz. 434, 437 (App. 1988). To prove apparent agency, Amick needed to show (1) that BDMC intentionally or inadvertently led her to believe Dr. Iskandar was its agent and (2) that she justifiably relied on BDMC's representations. *See Fadely v. Encompass Health Valley of Sun Rehab. Hosp.*, 253 Ariz. 515, 520 ¶ 15 (App. 2022), *review denied*, (Dec. 6, 2022).

**¶44** Amick asks us to adopt a standard employed in other jurisdictions. Under that standard, apparent authority exists between hospitals and doctors if the hospital "holds out" as providing services to the public. *See Jennison v. Providence St. Vincent Med. Ctr.*, 25 P.3d 358, 365–66 (Or. Ct. App. 2001). That standard, however, does not include Arizona's justifiable reliance requirement, which this Court applied in the hospital context only a short time ago in *Fadely*.[4] *See* 253 Ariz. at 520 ¶ 15. We, therefore, decline to apply Amick's proposed standard.

**¶45** Under the standard employed in *Fadely*, the record shows genuine issues of material fact as to both requirements of apparent agency. First, there is mixed evidence regarding whether BDMC led Amick to believe Dr. Iskandar was its agent—for example, while BDMC argues there is no proof Amick saw Dr. Iskandar's BDMC badge or what impact it had on her perception of Dr. Iskandar's relationship with BDMC, Amick disclosed she would testify that "she understood and believed" Dr. Iskandar was the BDMC in-house neurosurgeon and was employed by BDMC. BDMC relies heavily on the Condition Amick signed upon admission. But the Condition notified Amick only that physicians are "*generally not* employees or agents" of BDMC. Unlike the consent in *Fadely*, which unambiguously stated that all physicians were independent contractors, the Condition is equivocal as to Dr. Iskandar's status. Second, there is mixed evidence as to justifiable reliance—for example, the parties dispute the extent to which BDMC's holding out of Dr. Iskandar as its agent

---

[4] The superior court also did not have the benefit of *Fadely* when it issued the summary judgment decision.

caused Amick to rely upon the care or skill of Dr. Iskandar (as opposed to some other neurosurgeon). *See* Restatement (Second) of Agency § 267 (1958) (justifiable reliance); *see Fadely*, 253 Ariz. at 520 ¶ 15 (citing Restatement (Second) of Agency § 267 with approval). On the summary judgment record, a reasonable factfinder could decide either way on both prongs of apparent agency.

### C.   Actual Agency

**¶46**        Amick argues we can affirm summary judgment on alternate grounds based on actual agency between BDMC and Dr. Iskandar. That a physician is on a hospital staff does not necessarily render the physician a hospital's actual agent. *See Evans v. Bernhard*, 23 Ariz. App. 413, 417 (1975). When determining whether a physician is a hospital's agent, the fact finder must examine the specific relational facts between the hospital and the physician. *Id.* For a hospital to be liable for a physician's negligence on actual agency grounds, the focus is on the degree of the hospital's control over the physician. *See Gregg v. Nat'l Med. Health Care Servs. Inc.*, 145 Ariz. 51, 55 (App. 1985). This Court's prior decisions have analyzed the following factors to determine actual agency: whether the hospital arranged services for the physician's patients, whether the hospital handled all billing, whether the physician's services were provided exclusively through the hospital, whether the physician was the head of a hospital department, and whether the physician's group provided services pursuant to hospital rules and procedures. *See Beeck v. Tucson Gen. Hosp.*, 18 Ariz. App. 165, 170–171 (1972); *Barrett v. Samaritan Health Servs., Inc.*, 153 Ariz. 138, 146 (App. 1987).

**¶47**        Whether agency exists is generally a fact question and only becomes a legal question when all material facts are undisputed. *Ruesga v. Kindred Nursing Ctrs., L.L.C.*, 215 Ariz. 589, 596 ¶ 21 (App. 2007). The record shows disputed issues of material fact as to actual agency. On one hand, when treating Amick, Dr. Iskandar was working in the course and scope of his employment with EVN; all medical services Iskandar provided to Amick were billed through EVN; and Dr. Iskandar testified that BDMC did not dictate or control his clinical judgment when treating Amick. On the other hand, from 2009 to August 2017, Dr. Iskandar performed neurosurgery exclusively at BDMC; BDMC paid Dr. Iskandar $3,500 per 24-hour shift to be available for BDMC patients; BDMC furnished all operating rooms, equipment, nurses, and staff necessary for Dr. Iskandar to provide neurological services to his BDMC patients; and Dr. Iskandar served on various BDMC committees. The parties also dispute whether BDMC required Dr. Iskandar to comply with various policies and procedures, and, as explained, the Condition Amick signed upon admission did not

unambiguously disclaim an agency relationship. We, therefore, do not alternatively affirm summary judgment based on actual agency. On remand, the factfinder should decide the actual agency issue.

### D. Non-Delegable Duty

**¶48** Finally, Amick argues we should alternatively affirm partial summary judgment on her vicarious liability claim because BDMC owed her a non-delegable duty to provide competent emergency and surgical care. A principal may be liable for an independent contractor's negligence when the principal has a non-delegable duty. *Myers v. City of Tempe*, 212 Ariz. 128, 132 ¶ 17 (2006). However, non-delegable duties are few. *Id.* at 132 ¶18. Non-delegable duties may be imposed by common law, statute, contract, franchise, or charter. *Ft. Lowell–NSS Ltd. P'ship v. Kelly*, 166 Ariz. 96, 101 (1990). Without such authority, Arizona courts decline to recognize a non-delegable duty. *Santorii v. MartinezRusso, LLC*, 240 Ariz. 454, 458 ¶ 14 (App. 2016); *see Myers*, 212 Ariz. at 132–33 ¶¶ 17–19 (concluding that no authority imposes a non-delegable duty on a city to provide emergency services).

**¶49** Here, Amick provides no basis to find that BDMC owed her a non-delegable duty to provide neurosurgical care. Amick concedes that no Arizona appellate court has found that a hospital owes a non-delegable duty to provide surgical care in circumstances like this. Each Arizona case Amick cites involved a non-delegable duty owed by a land possessor or by a governmental entity pursuant to statute. *Kelly*, 166 Ariz. at 104 (finding a land possessor vicariously liable for invitees' injuries caused by an independent contractor, relying on the Restatement (Second) of Torts § 422(b)); *DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 144 Ariz. 6, 8 (1985) (county had a non-delegable duty to provide mental health evaluation and treatment to an involuntarily detained mental-hold patient pursuant to A.R.S. § 36-530); *Cooke v. Berlin*, 153 Ariz. 220, 223 (App. 1987) (noting in dicta that the state apparently "undertook" a non-delegable duty to provide adequate mental health care, citing *DeMontiney*, *supra*), *disapproved of on other grounds Dunn v. Carruth*, 162 Ariz. 478, 481 (1989) ; *see also Wiggs v. City of Phoenix*, 198 Ariz. 367, 369–70 ¶ 8 (2000) (recognizing that a municipality has a non-delegable duty to maintain its roadways, relying on the Restatement (Second) of Torts § 418).

**¶50** Further, Amick provides no contract between BDMC and Dr. Iskandar establishing a non-delegable duty to provide neurosurgical care. *See, e.g., Cohen v. Maricopa County*, 228 Ariz. 53, 57 ¶ 20 (App. 2011). And none of the state or federal statutes and regulations Amick cites imposed a

non-delegable duty on BDMC to provide neurosurgical care to her. Amick's non-delegable duty theory fails as a matter of law.

**¶51** We reverse the grant of summary judgment to Amick on the issue of vicarious liability and remand for a jury to resolve the genuine issues of material fact.

## CONCLUSION

**¶52** We reverse the superior court's rulings limiting the scope of Dr. Suber's testimony and precluding all evidence of Amick's second surgery. We also reverse the court's grant of partial summary judgment to Amick on BDMC's vicarious liability. We remand for a new trial consistent with this decision.

**¶53** Amick requests an award of attorneys' fees under A.R.S. § 12-349 stemming from BDMC's jurisdictional argument. In the exercise of our discretion, we deny Amick's request. We award Amick her costs on appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21.



AMY M. WOOD • Clerk of the Court
FILED: AA